### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **SHANE M. SPENCER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **08-40100-FDS** |
| | ) | |
| **STEPHEN ROCHE, GARY J. MORRIS,** | ) | |
| **CITY OF WORCESTER, and VHS** | ) | |
| **ACQUISITION SUBSIDIARY NUMBER 7,** | ) | |
| **INC., d/b/a SAINT VINCENT HOSPITAL,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### AMENDED MEMORANDUM AND ORDER ON
### DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a civil rights action arising out of a body cavity search. In 2005, Shane Spencer was arrested by the Worcester Police for driving on a suspended license. Shortly thereafter, a confidential informant notified officer Gary Morris that he believed Spencer had placed crack cocaine in his rectum just before he was arrested. Officer Morris and Sergeant Stephen Roche asked for Spencer's permission to conduct a search, but he refused. The officers then attempted a visual search, which was unsuccessful. Based on the information provided by the informant, the police applied for, and obtained, a warrant to search Spencer's "anal cavity" for cocaine.[1] Spencer was taken to Saint Vincent Hospital in Worcester, Massachusetts so that a physician could perform the procedure. After a digital search of Spencer's anal cavity was performed and no cocaine was found, the police requested, and the physician ordered, an x-ray of his abdomen.

---

[1] Because the search warrant used the term "anal cavity," this opinion will follow suit.

Spencer was transported to radiology by two nurses while he was handcuffed to a gurney.  The x-ray was performed and showed no sign of cocaine in his system.

Spencer has brought an action against Roche, Morris, the City of Worcester, and VHS Acquisition Subsidiary Number 7, Inc. ("VHS"), which operates Saint Vincent Hospital.  The complaint includes claims for (1) violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments of the U.S. Constitution, under 42 U.S.C. §§ 1983 and 1988 (2006); (2) violation of the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, §11(I) (2010); (3) assault and battery; (4) intentional infliction of emotional distress; (5) municipal/ supervisory liability; and (6) invasion of privacy.[2]

On September 30, 2010, the Court entered an order granting defendants' motions for summary judgment in part, and granting defendants' motion to strike plaintiff's cross-motion as untimely.  The order denied summary judgment as to the claims against Morris and Roche under section 1983 and for assault and battery and intentional infliction of emotional distress, and dismissed the MCRA claims, the municipal/supervisory liability claims against the City, and all claims against VHS.

On October 4, 2010, plaintiff filed a motion requesting the Court to reconsider three issues.  First, plaintiff asks the Court to reconsider its reading of *Longval v. Comm'r of Corr.*, 404 Mass. 325 (Mass. 1989), on which it based its dismissal of the MCRA claims.  Second, he contests the Court's determination that the nurse employees did not have a duty to question the restraints placed on him by Morris and Roche.  Finally, plaintiff disputes the Court's dismissal of his invasion of privacy claims.

---

[2] Count 6 is mislabeled "Count 8"; this opinion will refer to it as Count 6.

As reflected in the amended order below, the Court finds plaintiff's first request persuasive and has reconsidered its interpretation of *Longval*.  It is not persuaded by plaintiff's other arguments.  Accordingly, plaintiff's motion for reconsideration will be granted insofar as it seeks to preserve his MCRA claims against Morris and Roche and will otherwise be denied.

## I.     Background

The facts are presented in the light most favorable to plaintiff.

### A.     The Confidential Informant and Visual Cavity Search

On July 28, 2005, Shane Spencer was arrested in Worcester, Massachusetts, and charged with operating a motor vehicle after his license had been suspended.  (Defs.' Facts Exs. 4, 5).  Worcester police officer Gary J. Morris made the arrest, along with two officers named Lopez and Vo.  (*Id.* Ex. 5).  After Spencer was placed in the patrol wagon and transported to the station for processing, Morris received a call from a confidential informant.  (*Id.*).  The informant told Morris that just prior to the arrest, he observed Spencer place crack cocaine in his anal cavity.  (*Id.*).[3]  Morris immediately went to the police station and notified his supervisor, Sergeant Stephen Roche, of the informant's report.  (*Id.*).  Roche and Morris then went to see Spencer and told him that they had information that he was concealing drugs in his body.  (*Id.*).  The officers asked for Spencer to submit to a search of his anal cavity.  (Spencer Dep. 16).  When Spencer refused, the officers turned him around and pulled down his shorts.  (Defs.' Facts Ex. 5).  Spencer struggled with them and said "You ain't going near me."  (*Id.*).  While he was struggling, he tightly clenched his buttocks, and the officers were unable to determine if Spencer was hiding

---

[3] Spencer does not dispute these facts, which are set forth in the application for a search warrant.

anything.  (*Id.*).[4]

**B.    The Search Warrant**

Later on the evening of July 28, the police filed an application for a search warrant.  The

application included an affidavit by Morris describing the circumstances of the arrest, the

statements made by the confidential informant, and the unsuccessful visual search of the area.

(*Id.*).  A warrant was issued to search for cocaine "at Shane M. Spencer (d.o.b. x/x/xx) 'anal

cavity.'"  (*Id.*).  The warrant allowed for a search "on the person or in the possession of [Shane

M. Spencer (d.o.b. x/x/xx) 'anal cavity']."  (*Id.*).[5]

**C.    The Digital Search**

After the warrant was issued, Spencer was transported by Roche and Morris to Saint

Vincent Hospital in Worcester.  (Defs.' Facts Ex. 2 ¶ 10; Ex. 3 ¶ 10; Ex. 7 No. 3).  At triage, the

following was documented:  "patient suspected heroin and cocaine inserted rectally here with

police with warrant for cavity search."  (Defs.' Facts Ex. 8).

Spencer was seen by John E. Scola, M.D., who noted:  "20-year-old male enter [sic] for

cavity search for suspected drug (crack cocaine) in package."  (*Id.*).  After the warrant was

presented to Dr. Scola, he performed an anal cavity search.  (Defs.' Facts Ex. 2 ¶ 11; Ex. 3 ¶ 11;

Ex. 7 No. 3; Ex. 8).[6]  Roche and another officer placed Spencer on the bed, pulled off his pants,

---

[4] Although Spencer stated in his deposition that Roche and Morris threw him against the wall, he has not
asserted a claim for excessive force.

[5] Spencer does not challenge the validity of the search warrant.

[6] VHS contends that at the time of the incident, Dr. Scola was employed as a "panel member" at St.
Vincent Hospital.  (Defs.' Facts ¶ 14).  As a panel member, Dr. Scola was responsible for providing emergency
medicine coverage pursuant to the terms and conditions of an Emergency Department Panel Agreement.  (*Id.* Ex.
9).  Pursuant to the terms of that agreement, VHS contends that Dr. Scola was acting as an independent contractor.
(*Id.* Ex. 9 ¶ 8).  Plaintiff objects to these facts only on the basis that he believes them to be irrelevant to this action.

4

and held Spencer down by his arms and legs.  Dr. Scola lubricated his fingers and inserted two fingers into the anal cavity.  (Spencer Dep. 26).  Spencer recalls being handcuffed during the search.  (*Id.* 27).  No drugs were found.  (Defs.' Facts Ex. 7 No. 3).

Spencer refused to sign a conditions of treatment agreement or a release of medical records form.  (Spencer Dep. 35).

### D. The X-Ray

After the digital search, Roche became upset and told Dr. Scola that there was a possibility that Spencer had orally swallowed the drugs.  (Spencer Dep. 28).  At the request of Roche and Morris, Dr. Scola ordered a "KUB [kidneys, ureters, and bladder] & upright" x-ray study.  (Defs.' Facts Ex. 8; Pl.'s Facts Ex. 3).  Spencer was handcuffed to a gurney and escorted by at least two nurses to radiology.  (Spencer Dep. 25, 28-29, 31-33, 36, 38, 43).[7]  He repeatedly told the nurses and the radiology staff that he did not consent to an x-ray.  (*Id.*).  Despite Spencer's objections, an individual working at the hospital performed the x-ray.  (Defs.' Facts Ex. 8).  The handcuffs were removed during the procedure, during which time Morris sat next to Spencer.  (Spencer Dep. 31).

The radiology results were negative for the presence of cocaine.  (Defs.' Facts Ex. 8).  An individual employed by the hospital presented the x-ray results and radiologist's report to Roche, Morris, and an unidentified officer.  (Spencer Dep. 32-33).  The individual also informed them

---

(Pl.'s Facts ¶ 14-15).

[7] During Spencer's deposition, he was asked, "Did [any hospital employees] ever physically – did an employee ever physically restrain you?"  He answered, "They never physically restrained me, no."  (Spencer Dep. 43).  Later, Spencer submitted a change to his deposition.  He stated that, in the answer provided above, "no should be yes because they physically restrained me to gurney and tak [sic] me to x-ray though I said no to x-ray. . . .  I was confused/ misunderstood question."  (Id. 91).

that there was nothing found in Spencer's stomach area.  (Defs.' Facts Exs. 17-18).[8]  The

radiological consultation report noted that "[i]ngestion or insertion occurred approximately one

hour ago according to the accompanying police officers."  (Defs.' Facts Ex. 8).

## II.   Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Essentially,

Rule 56(c) mandates the entry of summary judgment 'against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st

Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making this

determination, the Court views "the record in the light most favorable to the nonmovant, drawing

reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).

As noted above, this order has been amended in response to plaintiff's motion for

reconsideration.  "[M]otions for reconsideration are appropriate only in a limited number of

circumstances: if the moving party presents newly discovered evidence, if there has been an

intervening change in the law, or if the movant can demonstrate that the original decision was

based on a manifest error of law or was clearly unjust."  *U. S. v. Allen*, 573 F.3d 42, 53 (1st Cir.

2009).  Plaintiff does not present any newly discovered evidence or intervening change in the law.

---

[8] The x-ray report indicates that Dr. Chetan Rajadhyaksha was the initial interpreting resident and that Dr. William A. Eddy was the interpreting attending physician.  (Defs.' Facts Ex. 8).  However, it is unclear who actually performed the x-ray or presented the findings to Officer Morris, though the person who presented the findings was a woman.  (*Id.*; Spencer Dep. 31).

Thus, Plaintiff must show that the Court's decision was based on a manifest error of law or was clearly unjust.  The granting of such a motion is "an extraordinary remedy which should be used sparingly."  *Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir. 2006).  "Unless the court has misapprehended some material fact or point of law, such a motion is normally not a promising vehicle for revisiting a party's case and rearguing theories previously advanced and rejected."  *Id.*

## III.   Analysis

### A.   Motion to Strike Plaintiff's Cross-Motion for Summary Judgment

Defendants have jointly moved to strike plaintiff's cross-motion for summary judgment, filed on November 30, 2009.  They contend that at the status conference held on September 11, 2009, the Court set a due date for dispositive motions of September 30, 2009.  They submit that, because plaintiff's cross-motion for summary judgment was filed on November 30 without leave of the Court to file a late submission, it was untimely and should be struck.  Plaintiff contends that the Court granted him an extension until December 3, 2009 to file a cross-motion for summary judgment.  The transcript from the September 11, 2009 status conference clearly indicates that plaintiff's cross-motion was due by November 6, 2009.  The cross-motion was therefore filed late and will only be considered as an opposition to defendants' motions.

### B.   Count 1 - Constitutional Claims under 42 U.S.C. §§ 1983 and 1988

The complaint asserts a claim under 42 U.S.C. §§ 1983 and 1988 against Roche and Morris for violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.  (Amend. Compl. ¶¶ 13-15).  Defendants have moved for summary judgment, contending that the searches conducted on plaintiff were supported by probable cause and under the authority of a valid search warrant.  For the reasons stated below, the motion for summary

judgment will be granted to the extent that the claim is based on the attempted visual search performed by the police officers at the police station and the digital search performed by Dr. Scola at the hospital, and denied to the extent that the x-ray search at the hospital exceeded that which was necessary to examine plaintiff's anal cavity.

### 1.     Visual Search

A search of a person incident to a valid arrest does not normally require a warrant. *United States v. Robinson*, 414 U.S. 218, 235 (1973) ("[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that amendment."). Thus, if the arrest was lawful, a searching officer does not need to have any further justification for performing a search of an arrestee. *See United States v. Bizier*, 111 F.3d 214, 217 (1st Cir. 1997). The search incident to arrest need not occur at the scene of the arrest, but "may legally be conducted later when the accused arrives at the place of detention." *United States v. Edwards*, 415 U.S. 800, 803 (1974).

However, not all warrantless searches of an arrestee are automatically permissible; any such search must be reasonable. A strip and visual body cavity search thus requires independent analysis for reasonableness under the Fourth Amendment. *Swain v. Spinney*, 117 F.3d 1, 7-8 (1st Cir. 1997). The evaluation of the constitutionality of a warrantless search requires a balancing of the "legitimate needs of law enforcement" against the invasion of personal rights that the search entails. *Id.* at 6-7; *See Bell v. Wolfish*, 441 U.S. 520, 560 (1979) (holding that visual body cavity searches of inmates must balance "the significant and legitimate security interests of the institution against the privacy interests of the inmates"). Courts must consider "the scope of the particular

intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted." *Swain*, 117 F.3d at 6 (quoting *Bell*, 441 U.S. at 559).

Strip and visual body cavity searches of arrestees obviously involve a highly intrusive invasion of privacy.  Such searches require an arrestee not only to strip naked in front of a stranger, but also to expose the most private areas of his body to others.  The First Circuit has "recognize[d], as have all courts that have considered the issue, the severe if not gross interference with a person's privacy that occurs when guards conduct a visual inspection of body cavities."  *Id.* (quoting *Arruda v. Fair*, 710 F.2d 886, 887 (1st Cir. 1983)).

Courts must, however, accommodate the reasonable needs of law enforcement.  Thus, some courts have held that a warrantless strip search may be justified by the need to discover and preserve concealed evidence of a crime.  *See, e.g.*, *Justice v. Peachtree City*, 961 F.2d 188, 193 (11th Cir. 1992).  *But see Fuller v. M. G. Jewelry*, 950 F.2d 1437, 1446 (9th Cir. 1991) (prison visual body cavity search with less than probable cause only permitted to protect institutional safety and security; search for evidence must be justified by probable cause).

In balancing these interests, courts have generally concluded that strip and visual body cavity searches must be justified by at least a reasonable suspicion that the arrestee is concealing contraband or weapons.  *See, e.g.*, *Swain*, 117 F.3d at 5-7; *Justice*, 961 F.2d at 192; *Masters v. Crouch*, 872 F.2d 1248, 1255 (6th Cir. 1989); *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986); *Stewart v. Lubbock County*, 767 F.2d 153, 156 (5th Cir. 1985); *Giles v. Ackerman*, 746 F.2d 614, 615 (9th Cir. 1984); *Mary Beth G. v. City of Chi.*, 723 F.2d 1263, 1273 (7th Cir. 1983).

Here, the officers had received information from a confidential informant that plaintiff was hiding narcotics in his anal cavity.  This information provided the officers with reasonable

suspicion sufficient to justify their visual search. Indeed, a warrant was later issued for a search of plaintiff's cavity based solely on this very evidence. Therefore, the visual search performed by officers Roche and Morris in the police station did not violate the Constitution.

### 2.    Digital Cavity Search

Defendants contend that because the digital search performed by Dr. Scola at the hospital was conducted pursuant to a valid warrant, the search was lawful and did not violate plaintiff's constitutional rights. Accordingly, they argue that summary judgment should be granted to the extent that the § 1983 claim is based on the digital search.

As noted, Spencer has not challenged the validity of the search warrant. Therefore, the Court will assume that there was probable cause to conduct the search. Nor is there anything in the record to suggest that the manner in which the search was conducted was unreasonable. The search was performed by a physician at a hospital in a manner that appears to have been medically appropriate, and Spencer has not presented any evidence that the digital search went beyond the scope of the warrant or was otherwise unnecessarily intrusive.

Accordingly, the Court finds as a matter of law that the digital cavity search was lawful. The motions for summary judgment will therefore be granted to the extent that Count 1 is based on the digital search.

### 3.    X-Ray Search

After the digital search found nothing, Roche became upset and told Dr. Scola that perhaps plaintiff had swallowed the cocaine. At Roche's urging, Dr. Scola ordered an x-ray examination. Although the record is not entirely clear, it appears that the x-ray search in part targeted Spencer's stomach and thus went well beyond that which was necessary to ensure that

there were no drugs in his anal cavity.[9]

Under both the Fourth Amendment and Article 14 of the Massachusetts Constitution, "[s]earches and seizures conducted outside of the scope of a valid warrant are presumed to be unreasonable." U.S. CONST. amend. IV; MASS. CONST. PART 1, ART. XIV; *Commonwealth v. Balicki*, 436 Mass. 1, 8 (Mass. 2002) (citing *Commonwealth v. Antobenedetto*, 366 Mass. 51, 57 (Mass. 1974)). Here, the warrant specifically was limited to a search of Spencer's "anal cavity." The officers did not have a reasonable basis for believing that Spencer had a packet of cocaine in his stomach.[10] There was literally no evidence suggesting that plaintiff had swallowed any cocaine before he was arrested. Therefore, a jury could reasonably find that the x-ray search was beyond the scope of the warrant, not supported by probable cause or reasonable suspicion, and therefore unconstitutional. To the extent, therefore, that the x-ray search targeted areas other than his "anal cavity" or exceeded that which was reasonably necessary to examine that particular area, summary judgment will be denied.[11]

C.     **Counts 2, 3, and 4 - State Law Claims**

Counts 2, 3, and 4 allege state law claims: violation of the Massachusetts Civil Rights

---

[9] The radiological consultation noted that, according to the officers, the drugs might have been ingested. This corroborates Spencer's position that possible ingestion was one of the grounds for the x-ray.

[10] Defendants submit that because the anal cavity was one of the many areas that was searched through the x-ray procedure, the procedure did not exceed the scope of the warrant. However, the inquiry is not whether the area covered by the warrant was part of the area actually searched, but rather whether areas *not* covered by the warrant were targets of the search. Here, there is evidence that the x-ray was ordered at least in part to search Spencer's stomach. The image of Spencer's "anal cavity" in the x-ray along with his stomach does not cure the deficiency.

[11] Defendants also note that the warrant did not identify the means by which the search should be conducted, and that the method for executing a warrant is often left to the discretion of police officers. However, the method of executing the warrant is not at issue here, but rather the scope of the warrant and whether the authority granted by the warrant was surpassed.

Act (Count 2); assault and battery (Count 3); and intentional infliction of emotional distress (Count 4). All three counts are brought against Roche, Morris, and VHS; VHS is sued as the employer and supervisor of Dr. Scola and the (unnamed) nurses who assisted in restraining Spencer and transporting him to radiology. Two threshold questions must be resolved as to all three counts: (1) whether VHS is responsible for the actions of Dr. Scola, as his employer; and (2) whether Dr. Scola and the nurses are entitled to qualified immunity.[12]

### 1.    Vicarious Liability

VHS contends that it cannot be vicariously liable for the tortious acts of Dr. Scola because he is an independent contractor, not an employee. Generally, employers of independent contractors are not subject to liability for harm caused to another by a tortious act or omission of the contractor. *See Vertentes v. Barletta Co.*, 392 Mass. 165, 168 (Mass. 1984); *Whalen v. Shivek*, 326 Mass. 142, 149-50 (Mass. 1950); *Ferguson v. Ashkenazy*, 307 Mass. 197, 200 (Mass. 1940). In order to determine whether an employer-employee relationship actually exists, courts normally consider a number of factors. *See* Restatement (Second) of Agency § 220(2) (1958). These factors may include, among other things, how the person is paid (for example, whether the person has taxes withheld by the employer), whether the employer has the right to direct or control the person, and whether the parties themselves believe they have created an employer-employee relationship. *Id.*; *See Dias v. Brigham Med. Assocs., Inc.*, 438 Mass. 317, 322 (Mass. 2002).

In the absence of evidence that a hospital reserved the right to direct and control a physician's decisions, a physician is usually considered to be an independent contractor. *See*

---

[12] Defendants Roche and Morris do not assert qualified immunity as a defense on summary judgment.

*Hohenleitner v. Quorum Health Res., Inc.*, 435 Mass. 424, 432 (Mass. 2001) ("[T]he very nature of the medical profession suggests that, in most instances, a physician acts as an independent contractor," but "a physician may be deemed a servant where the hospital controls details of the physician's physical activities."); *McNamara v. Honeyman*, 406 Mass. 43, 48 (Mass. 1989) ("While physicians exercise independent judgment, a physician can still be deemed a servant where the principal controls the details of the physician's activities."); *Kelley v. Rossi*, 395 Mass. 659, 662 (Mass. 1985). Here, Dr. Scola was employed subject to an "Emergency Department Panel Agreement" with the hospital. (Defs.' Facts Ex. 9). The contract states that his services will be "conducted under the direction of a physician Director . . . appointed by [the] Hospital" and provides that he "shall provide [s]ervices referred to [him] by [the] Hospital" (*Id.*). Finally, the contract states that he "shall act at all times under this Agreement as an independent contractor. The parties agree that [the] Hospital shall not have and shall not exercise any control or direction over the manner or method by which [Dr. Scola] provides the [s]ervices." (*Id.*). Plaintiff has produced no evidence tending to suggest the contrary.

The Court accordingly finds that Dr. Scola was an independent contractor at the time of the incident in question and that VHS cannot be held vicariously liable for any torts that he may have committed.[13]

### 2.   Qualified Immunity

Defendant VHS contends that its nurse employees are entitled to qualified immunity for their actions, and that it cannot be liable under a theory of vicarious or supervisory liability for

---

[13] VHS has not asserted that the nurses are independent contractors.

13

actions that are protected by immunity.[14]

### a.   Qualified Immunity for MCRA Claims

The Supreme Court has held that federal public officials who exercise discretionary functions are generally entitled to qualified immunity from liability for damages.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("[Federal] government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") (internal quotations omitted).  This have been construed to apply to § 1983 claims against state officials.  *Davis v. Scherer*, 468 U.S. 183, 194 n.12 (1984) (applying *Harlow's* holding to § 1983 claims and stating "our cases have recognized the same qualified immunity rules apply in suits against state officers under § 1983 and in suits against federal officers").  When it enacted the MCRA, the Massachusetts legislature intended to adopt the standard of immunity for public officials developed under 42 U.S.C. § 1983.  *Duarte v. Healy*, 405 Mass. 43, 46 (Mass. 1989).  More recently, the Supreme Judicial Court of Massachusetts has extended the qualified immunity protection to private parties who perform duties customarily carried out by public officials.  *See Rodriques v. Furtado*, 410 Mass. 878, 887 (Mass. 1991) (holding that a police officer and doctor were entitled to qualified immunity for conducting a vaginal cavity search pursuant to a warrant).  Therefore, the pivotal question is whether reasonable nurses under the same circumstances would have known that coercing plaintiff into submitting to x-rays of parts of

---

[14] Spencer has not identified the specific individuals who aided the officers in handcuffing him and moving him down the hall to radiology.  However, taking all inferences in the light most favorable to him, a reasonable jury could find that those individuals were nurses or similar employees working at the hospital, for whose actions VHS could be found responsible.  VHS has not presented any evidence to the contrary.  For purposes of this opinion, the Court refers to them simply as "nurses."

his body other than his anal cavity violated plaintiff's clearly established constitutional rights.  *See Id.* at 884; *Duarte*, 405 Mass. at 48-49.[15]  For the reasons discussed below, the Court concludes that the nurses are entitled to qualified immunity for their actions.

There are three areas where such an inquiry must necessarily focus:  (1) what degree of security, including the use of restraint, was appropriate under the circumstances; (2) whether the medical procedures (that is, the x-rays, including any necessary preparation) were performed properly; and (3) whether the medical procedure should have been performed at all.

As to the security issue, the nurses were acting at all times under the direction of uniformed police officers.  It would be unreasonable to expect them to decide whether handcuffs were necessary or otherwise what degree of restraint was appropriate, or to interfere with the officers' judgment in that respect.  Unless the security measures used were obviously improper, even to a lay person – for example, if the officers had been deliberately inflicting severe pain, or somehow endangering plaintiff's life – it was reasonable for the nurses to acquiesce to the request of the officers or to assist them in executing the restraints.[16]

As to the issue of how the medical procedures were to be performed, the nurses (like other health-care professionals) were required to exercise their independent professional judgment.  It was not the role of the police officers, for example, to decide how an x-ray should

---

[15] The Court need not reach the issue of qualified immunity with regard to Dr. Scola because plaintiff has failed to produce evidence of any acts taken by Dr. Scola that could be reasonably construed as threats, intimidation, or coercion; he is not even alleged to have participated in the act of restraining plaintiff.

[16] In his motion for reconsideration, plaintiff argues that every hospital employee has a duty to question police restraints on patients in all circumstances.  The Court finds this argument unpersuasive.  Among other things, it would be highly impractical, as any employee of the hospital would have the power to interfere with a medical procedure involving the use of restraint.  A far more reasonable approach is to permit hospital employees to acquiesce in the security measures required by law enforcement unless those measures are obviously improper.

be performed.  But here there is no issue as to whether the x-ray was performed in an improper or dangerous manner, or whether any other standard of medical care was violated; the issue is whether the x-ray search was unnecessarily extensive.

That leaves the question of whether the nurses reasonably should have known that performing an x-ray search of any area other than plaintiff's "anal cavity" would violate his clearly-established constitutional rights.  In this context, the resolution of that question is relatively easy.  Here, the Court need only consider the obligations of the nurses, not the physician who made the decision as to what procedures to employ.  It is not reasonable to assume that every health-care professional who interacts with a patient subject to a search warrant will personally read and analyze the warrant and determine whether its scope might be exceeded.[17] Nurses who are merely charged with transporting a patient from one location in the hospital to another, or preparing a patient for a medical procedure, cannot be held to the same standard as a trained law enforcement professional or even a treating physician.  Thus, a reasonable nurse in the position of the unnamed nurses in the complaint would not have known that aiding in handcuffing the plaintiff and transporting him down the hall to radiology violated his clearly-established constitutional rights.  The nurses are therefore entitled to qualified immunity as to the MCRA claim.[18]

Accordingly, summary judgment will be granted as to the claim against VHS for violations of the MCRA set forth in Count 2.

_____

[17] Plaintiff argues that every hospital employee has a duty to question all involuntary medical procedures involving law enforcement.  Again, the imposition of such a duty would be entirely unreasonable and impractical.

[18] VHS also asserts that its employees are entitled to quasi-judicial immunity, a question that the Court does not reach.

b.      **Immunity for Intentional Torts**

As a matter of logic, the qualified-immunity defense should also apply to any intentional

tort arising out of the exercise of a discretionary function by a public official.  However, the cases

have instead generally addressed claims of assault, battery, and intentional infliction of emotional

distress through a "reasonableness" inquiry similar to the analysis of the Fourth Amendment's

protection against the use of excessive force.  *See Dean v. City of Worcester*, 924 F.2d 364, 369

(1st Cir. 1991) (where conduct was objectively reasonable under Fourth Amendment excessive

force analysis, plaintiff's claims for assault, battery, and intentional infliction of emotional distress

must fail).  *See also Smith v. Hitchcock*, 27 F.3d 554 (1st Cir. 1994) (where no unreasonable

force was used by officers, claim for intentional infliction of emotional distress claim must fail);

*Nolan v. Krajcik*, 384 F. Supp. 2d 447, 472 (D. Mass. 2005)  ("The standard for determining

whether force is reasonable for assault and battery claims is essentially the same as the standard

for determining if force is reasonable for Fourth Amendment excessive force claims.") (internal

quotations omitted).  As a result, plaintiff's claims of intentional tort against the hospital

employees do not appear to be subject to a qualified immunity defense and will be addressed

below.

3.      **Count 2 - Massachusetts Civil Rights Act ("MCRA")**

Count 2 asserts a claim for violations of the Massachusetts Civil Rights Act, Mass. Gen.

Laws ch. 12, §11(I).  To establish a claim under the MCRA, plaintiff "must prove that (1) [his]

exercise or enjoyment of rights secured by the Constitution or the laws of either the United States

or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3)

that the interference or attempted interference was by 'threats, intimidation, or coercion.'"  *Bally*

17

*v. Ne. Univ.*, 403 Mass. 713, 717 (Mass. 1989).[19]  The elements of "threats" and "intimidation" under the MCRA usually require actual or threatened physical force.  *Kennie v. Natural Res. Dep't of Dennis*, 451 Mass. 754, 763 (Mass. 2008); *Ayasli v. Armstrong*, 56 Mass. App. Ct. 740, 751-52 (Mass. App. Ct. 2002).  Coercion, however, is a broader category that may rely on physical, moral, or economic coercion.  *See Kennie*, 451 Mass. at 763; *Haufler v. Zotos*, 446 Mass. 489, 505 (Mass. 2006); *Buster v. George W. Moore, Inc.*, 438 Mass. 635, 646-48 (Mass. 2003).  Massachusetts courts apply an objective "reasonable person" standard to determine whether conduct constituted threats, intimidation, or coercion.  *Haufler*, 446 Mass. at 505.

Here, the constitutional right at issue is set forth in the Massachusetts Declaration of Rights, Article 14, which grants every person the right to be free from "unreasonable searches." MASS. CONST. PART 1, ART. XIV; *Swain*, 117 F.3d at 11-12.  Plaintiff asserts that the x-ray search was not within the scope of the search warrant and therefore constituted an "unreasonable search"

---

[19] Mass. Gen. Laws ch. 12, § 11(I) provides:

> Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages.  Any aggrieved person or persons who prevail in an action authorized by this section shall be entitled to an award of the costs of the litigation and reasonable attorneys fees in an amount to be fixed by the court.

Mass. Gen. Laws ch. 12, § 11(H) provides:

> Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured.

under Article 14.[20]  The alleged acts of threats, intimidation, or coercion stem from the forcible

restraint of plaintiff in the hospital.

### a.    Interference with a Constitutional Right

Defendants assert that the x-ray search was reasonable and appropriate under the

circumstances and that, as a result, the plaintiff has not properly alleged interference with a

constitutional right.

Article 14 protections track Fourth Amendment protections.  *Swain*, 117 F.3d at 12.  As

an arrestee, it is unclear whether the search of plaintiff's person is subject to the Fourth

Amendment requirement of a search warrant and probable cause, a mere showing of "reasonable

suspicion," or a bare "reasonableness" standard.  *See, e.g.*, *Bell*, 441 U.S. at 558 (holding that

visual cavity searches of inmates and pretrial detainees are subject to a test of reasonableness,

rather than probable cause); *Swain*, 117 F.3d at 7 (arrestee visual body cavity searches for

evidence require at least reasonable suspicion); *Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir.

2008).  *But see Fuller*, 950 F.2d at 1449 (holding that a visual body cavity search requires

probable cause and a search warrant); *Commonwealth v. Thomas*, 429 Mass. 403, 408 (Mass.

1999) (holding probable cause to be required for strip and visual body cavity searches).  Even

under the bare standard of reasonableness, however, plaintiff has presented sufficient evidence

from which a jury could conclude that the x-ray search was not reasonable.

For the reasons discussed above, a reasonable jury could find from the facts presented that

---

[20] Defendants correctly assert that no common law cause of action exists under the Massachusetts Declaration of Rights.  Any claims for a violation of the rights secured by the Constitution of the Commonwealth must be pursued under the MCRA.  *See Cohen v. Newton Div. of the Dist. Court Dep't of the Trial Court*, 2010 WL 1051134 at *4 (Mass. Super. Ct. Mar. 9, 2010).  It appears that plaintiff has properly stated his claim under the MCRA, and the only remaining issue is whether that claim has any merit.

the x-ray search was not reasonable under the circumstances, taking into account the fact that, at

the time that Morris and Roche urged the doctor to order an x-ray, the officers did not have any

evidence suggesting that plaintiff had swallowed drugs.  They also knew that a digital search had

already been performed without any incriminating results, and therefore might have had reason to

doubt the credibility of the confidential informant's information.

The officers' lack of reasonableness under the Fourth Amendment necessarily precludes a

contrary finding under state law.  *Swain*, 117 F.3d at 12; *Rodriques*, 410 Mass. at 884 n.8.

Plaintiff has therefore put forth sufficient evidence of a violation of Article 14.

### b.      Threats, Intimidation, or Coercion

According to plaintiff, Roche and Morris handcuffed him to a gurney, rolled him on that

gurney into a radiology room, uncuffed him—presumably so as to avoid any interference the

metal handcuffs might have with the x-ray machine—and sat by his bed, thereby maintaining a

presence in the room while the x-rays were taken.  Plaintiff argues that this conduct was coercive

under the MCRA, as he did not consent to the x-ray and was physically restrained during the

transport process.[21]

In response, defendants cite *Longval v. Comm'r of Corr.*, 404 Mass. 325, 333 (Mass.

1989).  In *Longval*, a prisoner who was shackled and handcuffed as part of a transfer to a

segregation unit brought a claim under the MCRA, claiming a violation of his due process right to

a hearing prior to the transfer.  Although the Supreme Judicial Court held that resolution of the

issue on summary judgment was premature, it noted the following:

---

[21] In his motion for reconsideration, plaintiff argues that the Court misread and misapplied *Longval v. Comm'r of Corr.*, 404 Mass. 325, 333 (Mass. 1989) and that its dismissal of his MCRA claims was improper.  On reexamination of the cases following *Longval*, the Court agrees with plaintiff and will sustain his MCRA claims against Morris and Roche.

> . . . we see no coercion, within the meaning of the State Civil Rights Act, simply
> from the use of force by prison officials, authorized to use force, in order to
> compel a prisoner to do something he would not willingly do, even if it turns out
> that the official had no lawful right to compel the prisoner to take that action.
> Shackling and handcuffing [the plaintiff] and taking him to Concord was not by
> itself coercive under the Civil Rights Act, as [the plaintiff] claims.  If the officials
> had some further purpose in treating [the plaintiff] as they did, threats,
> intimidation, or coercion might be involved.  Conduct, even unlawful conduct,
> however, lacks these qualities when all it does is take someone's rights away
> directly.

*Id.* (internal citations omitted).  Morris and Roche argue that their restraint of plaintiff amounted to a "direct deprivation" under *Longval* and therefore does not constitute coercion under the meaning of the statute.

The MCRA contemplates a two-part sequence:  liability may be found where (1) the defendant threatens, intimidates, or coerces the plaintiff in order to (2) cause the plaintiff to give up something that he has the constitutional right to do.  *Goddard v. Kelley*, 629 F. Supp. 2d 115, 128 (D. Mass. 2009).  Although the holding in *Longval* is somewhat ambiguous, subsequent authorities have held that normally lawful restraint may constitute coercion under the MCRA if the causation requirement is met—in other words, if such restraint is applied in order to cause the plaintiff to give up his constitutional rights.  *See Davis v. Rennie*, 264 F.3d 86, 112 (1st Cir. 2001) (restraint of mental health patient by employees was coercion where it furthered constitutionally prohibited beating); *Bullock v. City of Bos.*, 1990 WL 150017, at *2 (D. Mass. Sep. 20, 1990) (refusal by nurse to treat sick inmate was coercion if in furtherance of constitutional deprivations); *Langton v. Sec'y of Pub. Safety*, 37 Mass. App. Ct. 15 (Mass. App. Ct. 1994) (involuntary psychological examination of inmate satisfied coercive conduct element of MCRA if intended to compel his silence); *LeMay v. Dubois*, 1998 WL 151174, at *1 (Mass. Super. Ct. Mar. 23, 1998) (disciplinary action against prisoner satisfied coercive conduct element

if meant to chill further complaint).  *Cf. Gallagher v. Commonwealth of Mass.*, 2002 WL 924243,

at *1 (D. Mass. Mar. 11, 2002) (no violation of MCRA where excessive force against prisoner

was not done in furtherance of violating some additional right).[22]

Here, Morris and Roche used force against plaintiff that they would normally be

authorized to use.  If their restraint of plaintiff was applied in order to conduct an unreasonable x-

ray search of plaintiff's body, however, then this restraint could qualify as "coercion" for the

purposes of the MCRA. Because a reasonable jury could so find, summary judgment will be

denied as to Count 2.

### 4.    Count 3 - Assault and Battery

Count 3 asserts a claim for common-law assault and battery.  Assault and battery is "the

intentional and unjustified use of force upon the person of another, however slight, or the

intentional doing of a wanton or grossly negligent act causing personal injury to another."

*Jesionowski v. Beck*, 937 F. Supp. 95, 105 (D. Mass. 1996) (quoting *Commonwealth v. McCan*,

277 Mass. 199, 203 (Mass. 1932)).  This amounts to the question of whether the "use of force

was objectively reasonable in [F]ourth [A]mendment terms."  *Dean*, 924 F.2d at 369;

*Jesionowski*, 937 F. Supp. at 105.  In applying this standard, plaintiff "must demonstrate that

[defendants'] actions were not objectively reasonable, viewed in light of the facts and

circumstances confronting [them] and without regard to [their] underlying intent and motivation."

*Jesionowski*, 937 F. Supp. at 104.

---

[22] In *Davis*, five mental health workers restrained the plaintiff, an involuntarily committed mental patient, while he was beaten by a sixth worker.  The First Circuit found that the restraint could constitute coercion under the MCRA.  264 F.3d at 111-12.  Citing *Longval*, the court noted that "absent [the sixth worker's] punching, the [five workers'] participation in the restraint would not have violated Davis' rights under the MCRA," because mental health workers normally have the right to restrain patients in a facility.  *Id.* at 112 n.18.

For the reasons discussed above, the Court finds that any use of force by the police to accomplish the visual search, the digital search, and any x-ray search of plaintiff's anal cavity was reasonable, and therefore outside the scope of common-law assault and battery.  See *Dean*, 924 F.2d at 369.  However, to the extent that the use of force was for an x-ray that was outside the scope of the warrant, and without probable cause, there is sufficient evidence to sustain such a claim.

As to the hospital employees, the Court finds that any use of force to aid the police officers in obtaining an x-ray of plaintiff's abdomen was reasonable, whether or not that x-ray was outside the scope of the warrant.  As noted, the "reasonableness" inquiry for intentional torts is closely related to the Fourth Amendment "reasonableness" inquiry for qualified immunity.  As discussed above, private parties who perform duties customarily carried out by public officials are entitled to qualified immunity in Massachusetts.  *Rodriques*, 410 Mass. at 887.  The Court can see no reason why private parties should not also be held to a reasonableness standard for intentional torts in the same circumstances.[23]  Here, the hospital employees who helped to restrain and transport the plaintiff were acting at all times under the direction of uniformed police officers. Unless the security measures were clearly improper—and here, there were not— it was reasonable for the nurses to acquiesce to the request of the officers or assist them in executing the

---

[23] Were the Court to hold otherwise, the apparent absence of qualified immunity for intentional torts would mean that private individuals acting under the direction of police officers could be held liable for intentional torts even where the police officers are not liable.  That would be a nonsensical outcome and would undercut *Rodriques. See also Commonwealth v. Sbordone*, 424 Mass. 802, 811 (Mass. 1997) (stating that non-law enforcement personnel should be governed by the same rules as law enforcement personnel in considering their conduct during [a] search).

restraints.[24]

### 5.      Count 4 - Intentional Infliction of Emotional Distress

Count 4 asserts a claim for intentional infliction of emotional distress.  To maintain a cause

of action for intentional infliction of emotional distress, plaintiff must establish that: (1) the

defendants intended to inflict emotional distress or that they knew or should have known that

emotional distress was the likely result of their conduct; (2) the conduct of defendants was

extreme and outrageous and beyond all possible bounds of decency and was utterly intolerable in

a civilized community; (3) that the actions of the defendants were the cause of plaintiff's distress;

and (4) the emotional distress sustained by plaintiff was severe and of such a nature that no

reasonable person could be expected to endure it.  *Agis v. Howard Johnson Co.*, 371 Mass. 140,

144-45 (Mass. 1976) (citing Restatement (Second) of Torts § 46 (1965)).  Defendants contend

that plaintiff has failed to provide evidence such that a reasonable jury could find in his favor with

regard to the first two elements of this offense.

### a.      Knowledge

A reasonable jury could conclude that Roche and Morris knew or should have known that

their actions would cause plaintiff to suffer severe emotional distress.  The officers were aware

that plaintiff had already been subject to a visual and digital search of his anal cavity.  They also

knew that there was no evidence to suggest that an x-ray search of his stomach would result in

any incriminating evidence, but they urged Dr. Scola to order one anyway.  Moreover, plaintiff

was repeatedly telling the nurses and the officers that he did not want to have the x-ray performed

---

[24] As discussed above, there is no issue as to whether the x-ray was performed in an improper or dangerous manner.

on him and that he wanted to speak to his lawyer.  Taking all facts and inferences in the light most

favorable to the plaintiff, a reasonable jury could find that the officers knew or should have known

that subjecting the defendant to an x-ray search of his stomach would cause him to suffer severe

emotional distress.[25]

### b. **Extreme and Outrageous Conduct**

Defendants further assert that plaintiff cannot show that their actions were extreme and

outrageous.  "To be considered extreme and outrageous, the defendants' conduct must be beyond

all bounds of decency and . . . utterly intolerable in a civilized community.  Liability cannot be

founded upon mere insults, threats, or annoyances."  *Sena v. Commonwealth*, 417 Mass. 250, 264

(Mass. 1994) (internal citations and quotations omitted).

As a matter of law, conduct that is legally required cannot be fairly called extreme,

outrageous, or intolerable.  *See Sena*, 417 Mass. at 264; *Martin v. Heimlich*, 2007 WL 2429702,

at *8 (Mass. Super. Ct. Aug. 9, 2007).  Therefore, for the reasons stated above, the visual and

digital strip searches cannot be the basis of plaintiff's intentional infliction of emotional distress

claims.  However, a reasonable jury could find that the x-ray search of his stomach was beyond

the permissible bounds of the warrant.  Therefore, a reasonable jury could find that the actions

taken by defendants Morris and Roche in effectuating the x-ray search of his stomach were

extreme and outrageous.[26]

---

[25] Because the court dismisses plaintiff's claim against the hospital on other grounds, the question of the nurse's knowledge is not addressed here.

[26] The defendants have not challenged plaintiff's ability to prove the remaining two elements of an intentional infliction of emotional distress claim—namely, causation and severe emotional distress.  As these elements have not been challenged, the Court will not inquire as to whether plaintiff is likely to meet his burden in proving these remaining elements.

With regard to the hospital employees, the Court finds that their conduct was not outrageous and that plaintiff's claim must fail as a matter of law.  Where no unreasonable force is used under a Fourth Amendment inquiry, a person's actions cannot be outrageous.  *Dean*, 924 F.2d at 369 (where conduct was objectively reasonable under Fourth Amendment excessive force analysis, plaintiff's claim intentional infliction of emotional distress must fail); *Smith*, 27 F.3d at 554 (where no unreasonable force was used by officers, intentional infliction of emotional distress claim was not outrageous).  As discussed above, the nurses' conduct was reasonable under the circumstances; thus, their actions cannot be considered outrageous for purposes of plaintiff's intentional infliction of emotional distress claim.

**D.**    **Count 5 - Municipal/Supervisory Liability**

Count 5 alleges that the City of Worcester maintained a policy, procedure, or custom of inadequately training its police officers, including Morris and Roche, on the proper justifications and limitations of strip and body cavity searches.  Plaintiff brings this claim under both § 1983 and the MCRA.  However, as a municipality, the city is not a "person" within the meaning of the MCRA.  *Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 591-92 (Mass. App. Ct. 2001).  Therefore, plaintiff's claim for municipal or supervisory liability arises, if at all, under § 1983.

To prevail on such a claim, plaintiff must show that "the municipality itself causes the constitutional violation at issue.  Respondeat superior or vicarious liability will not attach under § 1983."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Therefore, plaintiff must show both the existence of a policy or custom and a direct causal link between that policy and the alleged constitutional deprivation.  *City of Canton*, 489 U.S. at 385.  *See Santiago v. Fenton*, 891 F.2d 373, 381-82 (1st Cir. 1989).

Plaintiff does not point to any particular unconstitutional policy or practice, but rather contends that this incident, by itself, evidences such a policy.  However, where a policy is not unconstitutional by its terms, "considerably more proof than the single incident will be necessary to ultimately establish at trial both fault on the part of the municipality and the causal nexus between the policy and the constitutional deprivation."  *McGrath v. MacDonald*, 853 F. Supp. 1, 4 (D. Mass. 1994) (internal quotation omitted); *Okla. City v. Tuttle*, 471 U.S. 808, 824 (1984).  In such cases, the plaintiff must show that the municipality's policy is the "moving force of the constitutional violation."  *Monell*, 436 U.S. at 694.

Although plaintiff contends that the city has a policy or practice of failing to train its police officers on the limits of searches, he has presented no evidence to that effect.[27]  The Supreme Court has held that a municipality's failure to train its employees is "properly thought of as a city 'policy or custom'" actionable under § 1983 "[o]nly where [the] failure evidences a 'deliberate indifference' to the rights of its inhabitants."  *City of Canton*, 489 U.S. at 379 (only where municipality's failure to train evidences a "deliberate indifference" can such a shortcoming be properly thought of as a city "policy" actionable under section 1983); *Bordanaro v. McLeod*, 871 F.2d 1151, 1158 (1st Cir. 1989).  Without more evidence that the City of Worcester has exhibited deliberate indifference to the constitutional rights of those with whom the police would come into contact, plaintiff's claim cannot survive.

Plaintiff has not sufficiently established that any violation of his constitutional rights was

---

[27] Plaintiff implies that the officers intentionally left all facts relating to the x-ray search out of their search warrant return and police report.  This fact, if true, would suggest that the officers were acting contrary to the city's general policies and procedures and that they attempted to leave information out of their reports in order to avoid being disciplined for having deviated from those policies.

the fault of a deficient policy or custom on the part of the city.  Even when taking all facts and inferences in the light most favorable to the plaintiff, a reasonable jury could not find the city liable for a § 1983 violation based on an unconstitutional policy or practice.  Accordingly, the Court finds that plaintiff has "fail[ed] to reach the high standard the Supreme Court has set out for a finding of liability for inadequate training of police officers."  *Santiago*, 891 F.2d at 381.

### E.   Count 6 - Invasion of Privacy

Plaintiff's final claim is against VHS for invasion of privacy under "both state and federal statutory and common law privacy requirements, including, but not limited to the Health Insurance Portability and Accountability Act. . . ."  (Amend. Compl. ¶¶ 26-23).  The stated basis for the claim is that an unnamed hospital employee gave his x-ray results and the radiologist's report to the officers keeping him in custody.  Plaintiff testified that he was asked to sign a waiver form for the release of his medical records to the officers, but that he refused to do so.  Despite his clear objections, however, the employee provided the x-ray information to the officers.

### 1.   Health Insurance Portability and Accountability Act

The only statute that plaintiff explicitly identifies in Count 6 is the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").  Pub. L. No. 104-191, 110 Stat. 1936 (1996).  However, there is no private right of action for a violation of HIPAA's confidentiality provisions.  *Acara v. Banks*, 470 F.3d 569, 571 (5th Cir. 2006) ("Because HIPAA specifically delegates enforcement [to the Secretary of Health and Human Services], there is a strong indication that Congress intended to preclude private enforcement.").  Rather, a patient must file a written complaint with the Secretary of Health and Human Services through the Office of Civil Rights.  It is then within the Secretary's administrative discretion whether to investigate

28

complaints and conduct compliance reviews to determine whether covered entities are in

compliance. 45 C.F.R. §§ 160.306, 160.308 (2010). Therefore, any claim for invasion of privacy

under HIPAA fails as a matter of law.

### 2.        Common-Law Invasion of Privacy

Massachusetts has never recognized a common-law cause of action for invasion of

privacy. *See Alberts v. Devine*, 395 Mass. 59, 70 (Mass. 1985). To the extent, therefore, that

plaintiff's cause of action for invasion of privacy is based on state common law, it likewise fails as

a matter of law.

### 3.        Mass. Gen. Laws ch. 214, § 1B

Mass. Gen. Laws ch. 214, § 1B (2005) provides a right of action for invasion of privacy.[28]

"In order for a plaintiff to succeed on an invasion of privacy claim, he must prove not only that

the defendant unreasonably, substantially and seriously interfered with his privacy by disclosing

facts of highly personal or intimate nature, but also that it had no legitimate reason for doing so."

*Martinez v. New England Med. Ctr. Hosps., Inc.*, 307 F. Supp. 2d 257, 267 (D. Mass. 2004)

(citing *Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 409 Mass. 514, 518 (Mass.

1991)). "The statute obviously was not intended to prohibit serious or substantial interferences

which are reasonable or justified." *Schlesinger*, 409 Mass. at 518.

Plaintiff has not presented any evidence that the disclosing hospital employee's actions

were unreasonable under the circumstances. It is true that plaintiff refused to sign a release, and

that, despite his clear objections, the employee delivered the medical information to the officers.

---

[28] Mass. Gen. Laws ch. 214, § 1B provides, in relevant part:

A person shall have a right against unreasonable, substantial or serious interference with his
privacy.

However, even taking the facts as plaintiff alleges, there is no evidence suggesting that the nurse knew that the warrant did not justify the disclosure of plaintiff's x-ray results, nor was such a disclosure unreasonable or unjustified under the circumstances.[29]

## IV.   Conclusion

For the foregoing reasons, defendants' motions for summary judgment are GRANTED as to Counts 5 and 6; GRANTED in favor of defendants Roche and Morris as to Counts 1, 2, 3, and 4 to the extent that the claims are based on the visual search, digital search, or x-ray search of plaintiff's "anal cavity"; GRANTED in favor of defendant VHS as to counts 2, 3, and 4; and otherwise DENIED.

**So Ordered.**

 /s/ F. Dennis Saylor
F. Dennis Saylor IV

Dated:  November 8, 2010                    United States District Judge

---

[29] In his motion for reconsideration, plaintiff argues that the Court failed to consider the hospital's violation of its own policies in its determination of whether he has made out an invasion of privacy claim. However, plaintiff fails to show how the employees acted unreasonably in light of the hospital's policies. The hospital administrative procedure cited in his opposition includes an explicit exception to the confidentiality of medical records for compliance with "court order, subpoena, or state/federal statutes." (Pl. Facts Ex. 7). As noted, it was not unreasonable for the nurses to comply with Morris and Roche under the circumstances because they could have reasonably believed that the officers were acting pursuant to a court order.